**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JESSE TRUJILLO,

Plaintiff,

v.                                           No. CIV-04-0635 MV/WDS

JOE WILLIAMS, Secretary,
ELMER BUSTOS, Director New
Mexico Dept. of Corrections,

Defendants.

**MAGISTRATE JUDGE'S PROPOSED
FINDINGS AND RECOMMENDED DISPOSITION[1]**

Plaintiff Jesse Trujillo, a *pro se* prisoner proceeding *in forma pauperis*, filed ths 42 U.S.C. §1983 claim against various New Mexico corrections officials. Defendants Williams and Busto filed an Answer and Motion to Dismiss (Document 25), to which plaintiff filed opposition. The Court has read and considered all of the pleadings and evidence submitted by the parties. The United States Magistrate Judge, having considered the arguments of the parties, the record, relevant law, and being otherwise fully advised, finds and recommends that the Motion to Dismiss be granted. The Court makes the following findings and recommended disposition.

**PROCEDURAL AND FACTUAL HISTORY**

This matter is before the Court on remand from the Court of Appeals for the Tenth Circuit. The Court of Appeals reversed this Court's dismissal of Mr. Trujillo's claims against the Virginia defendants and directed this Court to "determin[e] . . . whether Mr. Trujillo's claims against the Virginia defendants should be transferred rather than dismissed. . . ." *Trujillo v. Williams*, 465 F.3d

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

1210, 1223 (10th Cir. 2006); *see also* 28 U.S.C. § 1631.  The Court of Appeals also reversed this Court's dismissal of plaintiff's claims for denial of due process, access to the courts, and equal protection. The Court of Appeals further directed that plaintiff be allowed "to amend his complaint to allege facts sufficient to 'overcome a presumption of government rationality,' " *Trujillo*, 465 F.3d at 1228; (quoting *Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995)), as to his equal protection claim.

On remand this Court considered several factors in determining whether to transfer or dismiss these claims, including whether a new action against the Virginia defendants would be time barred, whether plaintiff's claims against the non-resident defendants were likely to have merit, and whether the instant action against the non-resident defendants was filed in good faith.  The Court found on remand that, in the interest of justice, plaintiff's claims against the Virginia defendants should be transferred.  The Court also granted leave for plaintiff to file an Amended Complaint, which he did on April 4, 2007.

The claims transferred to Virginia were dismissed by the United States District Court for the Western District of Virginia.  That court ruled that plaintiff had previously filed a lawsuit raising the same claims against the same defendants.  Plaintiff's first Virginia lawsuit was dismissed pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief could be granted. See *Trujillo v. Young*, 2003 U.S. Dist. LEXIS 27756 (2003).  That dismissal was affirmed by the Fourth Circuit. *Trujillo v. Young*, 74 Fed. Appx. 276; 2003 U.S. App. LEXIS 18698 (2003).  The Virginia court dismissed plaintiff's second suit–the transferred claims–as malicious pursuant to 28 U.S.C. § 1915(e)(2) after concluding that the claims had been filed in New Mexico in bad faith, and to harass and inconvenience the defendants.

The Amended Complaint filed by plaintiff addressed one of the three issues remanded to this

2

Court, his alleged denial of prison employment. Plaintiff reiterated his allegation that he had been told by certain employees of the Virginia Department of Corrections (VaDOC) that there was a standing order from the New Mexico Corrections Department (NMCD) that no New Mexico prisoner housed at Wallens Ridge State Prison (WRSP) should be given employment of any kind. The amended complaint contained no allegation that either of the named New Mexico defendants, Joe Williams or Elmer Bustos, had been personally involved in denying him employment. The amended complaint contained no new allegations relating to plaintiff's access to the court claim or his claim that he had been wrongfully segregated in Virginia.

The issues remaining in this matter are plaintiff's complaints regarding classification, employment, and access to the courts.

Plaintiff alleges in his complaint that he was transferred to WRSP on April 12, 2002. He claims he received an immediate classification hearing from the Institutional Classification Authority (ICA). The ICA is part of the Virginia Department of Corrections and is responsible for the classification of prisoners in Virginia prisons. The ICA recommended that plaintiff be placed in segregation. According to plaintiff, the ICA conducted additional classification proceedings on July 9, 2002, October 8, 2002, and March 26, 2003. In each instance the ICA recommended that plaintiff continue in segregation. In the October 8, 2002 report the ICA's rationale for segregation was that plaintiff "needs longer period of adjustment. New Mexico inmate." In its March 2003 report the ICA deemed plaintiff a "threat to the institution."

Following the March 2003 ICA report that maintained him in segregation, plaintiff filed a grievance in which he sought an "annual review that complies with IOP 821-4.1[2] in order to assess

---

[2]The documents produced in this case do not make clear the specific meaning of "IOP" but it appears to be Internal Operating Procedure/Policy. There is no question, however, that all

change in security level and to set up a Treatment Plan." The warden at WRSP, S.K. Young, responded in writing to plaintiff's grievance on June 19, 2003, stating in pertinent part as follows:

> Investigation: Your initial classification was completed by New Mexico. Your counselor completes a progress report every six months, which is shared with New Mexico authorities. The VDOC cannot reclassify you unless given permission by New Mexico, as pursuant to the Corrections Service Contract (sic)[3].
> Policy/Procedure: This issue is governed by the NM/VA Corrections Service Contract.

Plaintiff pursued his grievance, alleging that the warden's stated position was contrary to the ICC. On July 10, 2003 plaintiff received a Level II grievance response from the VaDOC Regional Director. That response stated that since plaintiff was a New Mexico prisoner his annual review would be done in accordance with the policies and procedures from the New Mexico Department of Corrections, not pursuant to IOP 821.

Approximately six months later plaintiff filed a second grievance relating to classification. Warden Young sent a memo to plaintiff on February 12, 2004 that read as follows:

> The New Mexico Department of Corrections, via Interstate Compact Agreement (sic), has authorized the adaptation of all policies and procedures adopted by the Virginia Department of Corrections for those inmates housed in Virginia. However, matters relating to Connecticut (sic) inmate classifications are still handled by the Connecticut DOC. Please contact the New Mexico DOC for any information regarding classification issues.

In a formal grievance response dated March 5, 2004 the warden reiterated the information. On March 10, 2004 the VaDOC Regional Director signed a Level II grievance response form that contained the same information.

---

references to IOPs, such as this one, reference policies formulated by the VaDOC, not NMCD.

[3] The full name of the document is "Contract Between the State of New Mexico and the State of Virginia for the Implementation of the Interstate Corrections Compact." All further references will be to the Interstate Corrections Compact or "ICC."

Plaintiff filed the instant complaint on June 4, 2004. On June 28, 2004 plaintiff received another Level 1 grievance response form from Warden Young. It is unclear to the Court whether this was a supplemental response to an earlier grievance or a response to a further grievance filed by plaintiff. Warden Young's response, in pertinent part, was as follows:

> Your initial classification was completed by New Mexico. Mr. Parks at CCS[4] completed your reclassification. He is the Manager of Classification and has the final decision on security levels. His comments note you were assigned to Security Level 6 based upon score and institutional adjustment in Virginia and New Mexico. You questioned the length of time remaining, stating you only received 73 years total. Length of time remaining is not years sentenced but number of years from the date of the review to your release date. You (sic) classification was not completed in secret as you state but was completed by CCS in Richmond when you became a Virginia inmate.
> Policy/Procedure: Per DOP (sic) 823-7.5, Central Classification Services has the final authority to approve any security level reduction with or without the use of restrictors and discretionary overrides.

The New Mexico Defendants filed a Motion to Dismiss plaintiff's complaint that contained several affidavits from New Mexico Corrections Department (NMCD) employees. The affidavit of Alisha Lucero, Classification Administrator for the Classification Bureau of the NMCD, stated that she had reviewed plaintiff's file and the information contained in the file led her to believe that his classification while in custody in the State of Virginia was handled by personnel of the State of Virginia Department of Corrections. Ms. Lucero stated that she did not find any communication from NMDC to VaDOC requesting that plaintiff's classification be subject to the approval of the NMCD. Ms. Lucero noted that plaintiff was classified in the most restrictive level available in the NMCD before he was transferred to Virginia.[5]

---

[4]Central Classification Services, part of VaDOC

[5]Defendants' Motion to Dismiss notes that Plaintiff was convicted in September 1981 of Murder in the First Degree of a fellow inmate, Robert Carabajal and Murder in the First Degree of Correctional Officer Louis Jewett as well as Assault by a Prisoner of Correctional Officer

In view of the statements contained in several of the grievance response forms signed by Warden Young and information provided by Ms. Lucero in her affidavit, the Court ordered the defendants to provide the Court with certain documents identified by Ms. Lucero, and to specifically investigate whether there were any restrictions on classification or employment on prisoners such as plaintiff. The defendants filed a response to the Court order enclosing the reports from VaDOC identified by Ms. Lucero. The response included an affidavit by Jeff Serna, NMCD Classification Bureau Chief. Mr. Serna stated that it was neither the policy nor procedure for the NMCD to "proscribe, suggest or dictate that inmates transferred to another state are to be treated differently. . . or contrary to the standards established by the I.C.C." According to Mr. Serna, while NMCD may inform the receiving State of "the particular crimes and conduct of an individual transferred to the receiving state, the receiving state has sole and complete discretion regarding housing, programming, discipline, and classification of those inmates in their care and custody" in accordance with the I.C.C. Furthermore, Mr. Serna found nothing in plaintiff's file indicating that NMCD had directed VaDOC to treat plaintiff differently than any other inmate in their care.

The documents provided by Ms. Lucero consisted of two reports completed by the VaDOC dated December 10, 2002 and August 19, 2003, with copies provided to NMDC. Neither report suggests that classification or employment decisions were being made by NMDC. The later report includes details on two behavior infractions, Threatening Bodily Harm on May 30, 2003 (threatening to kill the inmate housed in the next cell) and Possession of a Weapon on July 8, 2003 (having a couple of razor blades and a sewing needle). As of the date of that report plaintiff was

---

Wayne Hecker. It is not clear from the record that Plaintiff's classification in the most restrictive conditions in 2002 resulted directly from these convictions, it appears that Plaintiff had engaged in other activities that resulted in his spending significant portions of his sentence highly restricted.

serving isolation for the weapons charge. The later report also included "Counselor Comments" to the effect that "Inmate Trujillo spends most of his time on filing litigation claims as to why he can not be classifed (sic) in the Virginia DOC. He can best be discribed (sic) as a dangerous predator. He has been assaultive in the past and he will be assaultive again if given the opportunity."

The Defendants provided a copy of the ICC to the Court for review. The ICC is unequivocal as to both classification and employment:

> 15. TRAINING OR EMPLOYMENT
> Inmates from the sending state shall be afforded the opportunity and shall be required to participate in programs of occupational training and industrial or other work on the same basis as inmates of the receiving state. . . Any such inmates of the sending state shall be subject to the regular work discipline imposed upon other inmate participants in the particular program.[6]
> . . .
>
> 16. DISCIPLINE
> The receiving state, as agent for the sending state, shall have physical control over and power to exercise disciplinary authority over all inmates from sending states.
> . . .
>
> 17. LAWS AND REGULATION
> Inmates while in the custody of the receiving state shall be subject to all the provisions of law and regulations applicable to persons committed for violations of the law of the receiving state not inconsistent with the sentence imposed.
>
> 18. RECORDS AND REPORTS FROM RECEIVING STATE
> Within ninety (90) days following the receipt of an inmate from the sending state, the receiving state shall furnish an admission classification report outlining the inmate's background, medical, psychiatric, education and vocational findings and indicating the institutional program which has been recommended.

## STANDARD OF REVIEW AND ANALYSIS

As an initial matter, although there is no indication whether this motion was filed under Rule

---

[6] The only employment restriction the ICC places on out-of-state inmates is that they may not be permitted or required to participate in a work program contrary to the laws of the sending state. This restriction is not at issue in this case.

12 or Rule 56 of the Federal Rules of Civil Procedure, matters outside the pleadings were presented by both parties in support of, or opposition to, the motion. Accordingly, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. *Celotex v. Catrett*, 477 U.S. 317 (1986). The moving party must initially establish the absence of a question of fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Thereafter, Rule 56 requires the responding party to go beyond the pleadings and identify sufficient evidence to show that there is a genuine issue for trial. *Allen v. Muskogee Oklahoma*, 119 F.3d 837, 841 (10th Cir. 1997) *cert. denied*, 118 S. Ct. 1165 (1998).

An issue is "genuine" if "a rational juror could find in favor of the nonmoving party on the evidence presented." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184 (10th Cir. 2000). The inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Although the Court views the evidence in a light most favorable to the nonmovant, it is not enough that the nonmovant's evidence be "merely colorable" or anything short of "significantly probative." Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is "no genuine issue for trial." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)(citing *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)).

There is substantial evidence in this case that no individual employed by the New Mexico

Corrections Department, let alone the two named defendants, played any role in classifying Plaintiff or limiting his employment while he was housed at WRSP in Virginia. Defendants submitted affidavits that addressed this issue in support of their initial motion to dismiss. More recently, in response to a specific request from the Court, defendants supplemented those exhibits with additional exhibits and affidavits supporting defendants' position that plaintiff's security classification and employment status at WRSP were determined solely by the Virginia Department of Corrections. The Interstate Corrections Compact is similarly unequivocal that the responsibility for security classification and employment lies with the receiving, not sending, state.

The only documents generated in connection with plaintiff's security classification at WRSP were generated by the VaDOC. Furthermore, plaintiff's own complaint alleges that he received an immediate classification hearing from the Institutional Classification Authority (ICA). The ICA is part of the Virginia Department of Corrections and is responsible for the classification of prisoners in Virginia prisons. According to plaintiff's complaint, the ICA recommended that plaintiff be placed in segregation, and then conducted additional classification proceedings on July 9, 2002, October 8, 2002, and March 26, 2003. In each instance, according to plaintiff, the ICA recommended that plaintiff continue in segregation. In the October 8, 2002 report the ICA's rationale for segregation was that plaintiff "needs longer period of adjustment. New Mexico inmate." In its March 2003 report the ICA deemed plaintiff a "threat to the institution." The VaDOC sent at least two reports to the NMCD advising of plaintiff's status at WRSP. One of these reports contained the VaDOC's assessment that plaintiff was a "dangerous predator" who had been assaultive and would be so again if given the chance. None of the ICA documents or the two reports indicated that the VaDOC was deferring to NMCD on classification or employment issues. Nor is there any indication of why the ICA would have conducted at least four classification proceedings

9

if they had no authority, or believed they had no authority, to classify plaintiff.

Additionally, plaintiff's amended complaint notes that on three other occasions he was transferred by NMCD to out-of-state prisons, and on those occasions he was classified by the receiving state and allowed to work.

There is no question that in June 2003, February 2004, and March 2004 Warden S.K. Young at WRSP advised plaintiff that VaDOC could not reclassify plaintiff unless given permission to do so by the NMCD. It is also uncontradicted, however, that in June 2004, within weeks of plaintiff's filing of this complaint, the Warden retracted his earlier assertion that NMCD had reserved control of plaintiff's classification. The Warden's June 28, 2004 memo tracks with the other documentation in the case, noting that Plaintiff was classified by CCS in Richmond, VA when he became an inmate, as stated by plaintiff in his complaint. Further, the Warden noted that CCS had "the final authority to approve any security level reduction." This statement is congruent with the assertions of the New Mexico defendants in this case, as well as the Interstate Corrections Compact.

Additionally, although this matter was initially filed in New Mexico against employees of both the NMCD and VaDOC, the claims against the employees of the VaDOC were transferred to Virginia upon a finding that this Court had no jurisdiction over those defendants. As such, there is a question regarding the amount of testimony–if any–that would be available from the VaDOC officials if this matter went to trial in New Mexico. For example, plaintiff's bare assertion that prison guards employed by VaDOC told him that NMCD was obstructing his employment at WRSP is pure hearsay and does not serve to create a "genuine issue for trial."[7]

---

[7]In his amended complaint, plaintiff alleges that in February 2004 an unnamed housing unit Lieutenant tried to secure employment for him as a shower cleaner. Plaintiff claims that the lieutenant "stated specifically that plaintiff was being given this consideration because in all his time at WRSP plaintiff had never caused any problems." The evidence in this case, however, is

In summary, defendants in this matter flatly deny any participation in plaintiff's security classification or employment at WRSP. Plaintiff acknowledges that on three other occasions where he was moved to out of state prisons there was no interference by defendants with his classification or employment opportunity, and that, to the contrary, he was required to work. The ICC clearly places the responsibility for classification and employment with the receiving state, Virginia. Plaintiff was classified on arrival by VaDOC, and VaDOC revisited plaintiff's classification several times over the ensuing two years. None of the VaDOC classification paperwork indicates that VaDOC was deferring to NMCD on any matter. While there are several memos from the WRSP warden, not the VaDOC classification authority, stating that New Mexico had retained classification authority over plaintiff, there is no documentary evidence of that fact and there is a final memo from the warden to plaintiff acknowledging that his classification had been at all times, and would be in the future, conducted in accordance with VaDOC operating procedures, by VaDOC staff who had "final authority" to approve any security level reduction.

In the Court's opinion neither the statements by the warden, which were subsequently corrected, nor the hearsay statements regarding employment that plaintiff attributes to unnamed prison guards create a genuine issue for trial, and the Court recommends that plaintiff's equal protection claim and his claims under the Eighth and Fourteenth Amendments relating to alleged interference by the NMCD in security classification and employment be dismissed.

An additional aspect of plaintiff's complaint regarding classification and employment was a request for injunctive relief against the New Mexico defendants, enjoining them from further

---

that by February 2004 plaintiff had been classified by VaDOC as a "threat to the institution," had been described by the VaDOC as a "dangerous predator," had been disciplined for threatening to kill a fellow inmate, and disciplined for weapons possession.

interference with his classification or employment within the Virginia prison system. Based on the above recommendation that plaintiff's allegations are unfounded and do not present a genuine issue for trial, the Court sees no basis for injunctive relief. The Court does, however, note that defendants have unequivocally taken the position in this litigation that they did not interfere in plaintiff's classification or employment, and *that they did not have the legal authority to do so.* Based on the Court's reading of the ICC, the Court agrees with the position taken by the NMCD in this matter. There is no basis for the Court to suspect or anticipate that NMCD would attempt in the future to influence or interfere with plaintiff's classification or employment, but any such efforts would be contrary to the ICC.

Finally, the Court addresses plaintiff's access to the court claim. This claim was originally dismissed, but reinstated on remand from the Tenth Circuit. The Tenth Circuit found that plaintiff's claim that he was expected to know exactly what he needed without any knowledge of what was available to him–an "exact cite" system-- might state a viable claim.

The Supreme Court's access to courts jurisprudence requires that prisons provide to inmates either adequate legal assistance or access to an adequate legal library. See *Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977). Federal courts have condemned library access programs that require an inmate to provide an exact citation without help or access to a physical library or "starter" materials like treatises, citators, or digests. See *Cepulonis v. Fair*, 732 F.2d 1, 4 (1st Cir. 1984) ("It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult."); *Rich v. Zitnay*, 644 F.2d 41, 43 (1st Cir. 1981) (holding that "the requirement that plaintiffs supply precise citations to the University of Maine Law School is obviously a Catch 22"); see also *Messere v. Fair*, 752 F. Supp. 48, 50 (D. Mass. 1990)("Because specific citations are required to access materials from the state library, I find that this copying service fails to satisfy

constitutional requirements. It is doubtful that many lawyers and judges could do minimally adequate research if they were required to request materials by mail via specific citations."); see also *Clayton v. Tansy*, 26 F.3d 980, 982 (10th Cir. 1993).

At the request of the Court, the defendants provided Corrections Department Policy 121000, titled Legal Access, for the Court's review. The purpose of the document is to "ensure that all inmates have direct access to the courts in allowable legal actions." The document includes an example of a document captioned "Inmate Request for Legal Access." An inmate requesting legal access is directed to "Briefly describe your legal problem or question. (Use a blank sheet of paper if additional room is needed.). The inmate is also directed to note a court imposed deadline, if any. Inmates are advised that form packets are available for various types of legal actions such as tort, state habeas, civil rights, federal habeas and state appeal.

Inmates are provided with a list of available "Legal Texts and Resource Material" including, for example, frequently requested caselaw such as *Lewis v. Casey*, *Ferguson v. NMCD*, *Porter v. Nussle* and *Shaw v. Murphy*. Also included are state and federal court rules, NMCD policies, and frequently requested statutes such as the 1996 Prison Litigation Reform Act, 1996 Antiterrorism and Effective Death Penalty Act, and the Americans with Disabilities Act. According to Attachment 121001.D, once the designated staff member reviews the prisoner's request form, the staff member is directed to determine whether the issue on the request form meets the criteria of a qualified legal request[8], and if it does the staff member is directed to provide qualified legal assistance.

Sean Shannon was the staff member employed by the NMCD to respond to out-of-state

---

[8] For "non-qualified legal claims" such as divorce or dissolution of marriage, restoration of drivers license, motion for reconsideration of sentence, or probate law, the NMCD provides sample forms to be hand copied by the prisoner and returned unmarked.

inmate requests, and he submitted an affidavit recounting his interaction with plaintiff from 2002 to 2004. Plaintiff submitted four requests during that period of time. The first two requests were for specific documents, but there is no indication that plaintiff was compelled to make such specific requests, rather than that he knew what he was asking for. Plaintiff's two subsequent requests, in fact, include the sort of "issue" requests that would not have been deemed sufficient if NMCD were operating an "exact cite" system. Plaintiff's requests include a general request for habeas corpus and mandamus statutes, a general request for mandamus and in forma pauperis forms, and a general request for information regarding where and how those forms should be filed. Mr. Shannon responded by supplying copies of court rules that answered plaintiff's questions, and which had not been requested by cite by plaintiff. Mr. Shannon also provided a free process packet and a list of court addresses that was responsive to plaintiff's other general requests.

Finally, plaintiff submitted a request to Mr. Shannon in which he stated that he was not exactly sure what he was looking for, but that it was in regard to life sentence statutes and parole eligibility prior to July 1, 1979. Again, Mr. Shannon provided the statute that was responsive to Plaintiff's general request, and offered the additional information that outdated statutes could be obtained through the University of New Mexico Law Library, address enclosed.

The Court notes that the exchanges between Mr. Shannon and plaintiff typically took over two weeks to complete, with Mr. Shannon typically completing his work within days. The majority of the time involved passage of the mail through the prison legal systems. Furthermore, it is undisputed that the ICC requires the sending state to provide legal assistance to prisoners house out-of-state.

The Court recommends that plaintiff's claim for denial of access to the courts be dismissed with prejudice. There is no genuine issue as to any material fact regarding whether NMCD's legal

access policy constitutes an "exact cite" system. It does not. Policy CD-121000 does not describe an exact cite system, and Plaintiff's legal requests, and Mr. Shannon's response to them, negate the suggestion that the system was operated as an exact cite system notwithstanding the provisions of CD 121000.

## RECOMMENDED DISPOSITION

The Court recommends that defendant's Motion to Dismiss be granted and that plaintiff's 42 U.S.C. §1983 claim be DISMISSED with prejudice.

_____
W. Daniel Schneider
United States Magistrate Judge